## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| PENINSULA TECHNOLOGIES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 2:25-cv-1036 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| | § | |
| CELLCO PARTNERSHIP D/B/A | § | |
| VERIZON WIRELESS, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Peninsula Technologies, LLC ("Peninsula") files this Complaint against Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon" or "Defendant") for infringement of U.S. Patent No. 9,844,009 (the "'009 Patent"), U.S. Patent No. 11,889,471 (the "'471 Patent"), U.S. Patent No. 11,910,404 (the "'404 Patent"), U.S. Patent No. 11,917,549 (the "'549 Patent"), U.S. Patent No. 12,004,087 (the "'087 Patent"), U.S. Patent No. 12,120,775 (the "'775 Patent"), and U.S. Patent No. 12,207,201 (the "'201 Patent"), collectively, the "Asserted Patents."

## THE PARTIES

1.      Peninsula Technologies, LLC is a Texas limited liability company, with a principal place of business at 812 West McDermott Dr. #1037, Allen, TX 75013.

2.      On information and belief, Cellco Partnership d/b/a Verizon Wireless is a general partnership organized and existing under the laws of Delaware, with its principal place of business at 1 Verizon Way, Basking Ridge, New Jersey 07920. Verizon is doing business, either directly or through its agents, on an ongoing basis in this judicial district and elsewhere in the United States, and has a regular and established place of business in this judicial district. Verizon may be served

through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

3.      Verizon, either itself and/or through the activities of its subsidiaries, makes, uses, sells, offers for sale, and/or imports throughout the United States, including within this District, products and services that infringe the Asserted Patents and/or uses methods covered by the Asserted Patents in the United States as further described below.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has specific and general personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, *inter alia*, (i) Defendant has engaged in continuous, systematic, and substantial business in Texas; (ii) Defendant is registered to do business in Texas; (iii) Defendant maintains regular and established places of business in this District; (iv) Defendant has committed and continues to commit, acts of patent infringement in this State and in this District. Such acts of infringement include the making, using, and selling of cellular services that leverage and infringe the inventions of the Asserted Patents (as more particularly identified and described throughout this Complaint, below) in this State and this District.

6.      Defendant maintains a "regular and established" place of business in this district, including by (a) maintaining or controlling retail stores in this district and (b) maintaining and operating infringing base stations in this district, including on cellular towers and other installation sites owned or leased by Defendant. Defendant's significant physical presence in this District

includes, but not limited to, ownership of or control over property, inventory, or infrastructure. For example, Defendant maintains retail stores located at 2035 North Central Expressway, Suite 620, McKinney, Texas 75070; 8988 South Broadway Avenue, Tyler, Texas 75703; and 2330 Preston Road, Suite 500, Frisco, Texas 75034, all of which lie within this federal judicial district.

7.     In addition, Defendant has derived substantial revenues from its infringing acts occurring within this State and this District. It has substantial business in this State and this District, including: (i) at least part of its infringing activities alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods and services provided to Texas residents. Defendant derives benefits from its presence in this federal judicial district, including, but not limited to, sales revenue and serving customers using its mobile network in this District. For example, Defendant receives revenue from its corporate stores in this District and through its website (verizon.com), by selling network access, phones, and services, and by receiving payment from customers in this District for network access, phones, and services. Defendant derives benefits from its presence in this federal judicial district, including, but not limited to, sales revenue and serving customers using its mobile network in this District.

8.     Defendant has, thus, in the many ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to the exercise of this Court's personal jurisdiction over it. Indeed, Defendant has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its commission of acts of patent infringement as alleged in this Complaint that are purposefully directed towards this State and District.

9.      Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1400(b) because, among other things, (i) Defendant is subject to personal jurisdiction in this District; (ii) Defendant has committed acts of patent infringement in this District; and (iii) Defendant has regular and established places of business in this District. Defendant maintains "regular and established" places of business in this district, including the numerous retail stores in this District through which it transacts business.

## **BACKGROUND**

10.      On information and belief, Verizon is the largest mobile network operator (MNO) in the United States and serves more than 146 million subscribers. *See* https://www.verizon.com/about/file/75791/download?token=r3sTWgCV (at p. 11).

11.      Verizon's mobile network contains its own core network and an estimated 80,000 active cell sites (i.e., base stations). *See* https://insidetowers.com/verizon-towers-up-for-sale/; *see also* https://www.verizon.com/about/sites/default/files/2024-Annual-Report-on-Form-10k.pdf.

12.      Verizon's 4G and 5G mobile networks are 3GPP compliant and include (or are rolling out) 3GPP Release 15, Release 16, and Release 17 features. *See, e.g.,* https://www.fierce-network.com/wireless/verizon-boasts-first-5g-call-using-3gpp-based-standards; *see also* https://www.verizon.com/about/news/enhanced-video-calling; *see also* https://www.mediatek.com/tek-talk-blogs/mediatek-unveils-verizon-business-internet-gateway-with-wi-fi-7-and-5g-support; *see also* https://www.ericsson.com/en/press-releases/6/2023/verizon-ericsson-and-mediatek-advance-the-5g-low-cost-low-power-device-ecosystem; *see also* https://www.mobileworldlive.com/verizon/ericsson-mediatek-drive-verizon-redcap-trials/.

## THE ASSERTED PATENTS

13.     Peninsula is the sole and exclusive owner of all right, title, and interest in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its rights in, and to, the Asserted Patents, including the filing of this patent infringement lawsuit. Peninsula also has the right to recover all damages for past, present, and future infringements of the Asserted Patents and to seek injunctive relief as appropriate under the law.

14.     The '009 Patent is entitled, "Power headroom report in a wireless device with carrier aggregation." The '009 Patent lawfully issued on December 12, 2017, and stems from U.S. Patent Application No. 15/470,145 filed on March 27, 2017.

15.     The '471 Patent is entitled, "Paging time adjustment in a wireless network." The '471 Patent lawfully issued on January 30, 2024, and stems from U.S. Patent Application No. 18/103,293 filed on January 30, 2023.

16.     The '404 Patent is entitled, "Physical uplink shared channel processing period." The '404 Patent lawfully issued on February 20, 2024, and stems from U.S. Patent Application No. 18/103,286 filed on January 30, 2023.

17.     The '549 Patent is entitled, "Scaling transmission power of uplink signals of a wireless device." The '549 Patent lawfully issued on February 27, 2024, and stems from U.S. Patent Application No. 17/864,010, which was filed on July 13, 2022.

18.     The '087 Patent is entitled, "Prioritizing uplink signals of a radio access technology." The '087 Patent lawfully issued on June 4, 2024, and stems from U.S. Patent Application No. 18/104,914, which was filed on February 2, 2023.

19.     The '775 Patent is entitled, "Multi access packet/protocol data unit session." The '775 Patent lawfully issued on October 15, 2024, and stems from U.S. Patent Application No. 17/516,252, which was filed on November 1, 2021.

20.     The '201 Patent is entitled, "Uplink power control in a wireless device." The '201 Patent lawfully issued on January 21, 2025, and stems from U.S. Patent Application No. 17/746,774, which was filed on May 17, 2022.

21.     Peninsula and its predecessors complied with the requirements of 35 U.S.C. § 287, to the extent necessary, such that Peninsula may recover pre-suit damages for the Asserted Patents.

22.     The claims of the Asserted Patents are directed to patent eligible subject matter under 35 U.S.C. § 101. They are not directed to an abstract idea, and the technologies covered by the claims comprise systems and/or consist of ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

## NOTICE

23.     By letter dated April 11, 2023, the applicant and prior assignee of the Asserted Patents notified Verizon of the '009 Patent and the applications that issued as the '471 Patent, '404 Patent, '549 Patent, '087 Patent, and '201 Patent, and invited Verizon to hold a licensing discussion.

24.     By letter delivered February 8, 2025, as well as through other correspondence and communications with Verizon prior to the filing of this Complaint, Peninsula via its licensing agent notified Verizon of the Asserted Patents and its infringement, provided claim charts for each of the Asserted Patents identifying exemplary infringed claims and exemplary infringing Verizon products and services, and invited Verizon to proceed with a licensing discussion with Peninsula.

25.     More specifically, claim charts for each of the Asserted Patents identifying exemplary infringed claims and exemplary infringing Verizon products and services were made available for download in a private data room on February 26, 2025. The private data room was

accessed and files were downloaded by Verizon via an IP address in Colorado Springs, Colorado on February 26, 2025 and again via an IP address in Plano, Texas on April 30, 2025.

## COUNT I

### (INFRINGEMENT OF U.S. PATENT NO. 9,844,009)

26.    Plaintiff incorporates the preceding paragraphs herein by reference.

27.    Peninsula is the assignee of the '009 Patent, with ownership of all substantial rights, title, and interest in and to the '009 Patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

28.    The '009 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on December 12, 2017, after full and fair examination.

29.    Defendant has directly infringed and directly infringes one or more claims pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, including at least claim 1[1] of the '009 Patent in this District and elsewhere in Texas and the United States through the provisioning and operation of its cellular network. Such infringement includes, but is not limited to, the making, using, offering to sell, and selling of cellular services, products, and/or networks that leverage and infringe the inventions of the '009 Patent, and Defendant performing methods covered by the inventions of the '009 Patent. Defendant's 5G cellular network includes base station equipment configured to support 5G communications (collectively, the "'009 Accused Instrumentalities"). The '009 Accused Products are configured to operate, and do operate, according to 3GPP standards and, as illustrated below, support and implement media access control messaging techniques covered by the '009 Patent.

---

[1] Throughout this Complaint, wherever Peninsula identifies specific claims of the Asserted Patents infringed by Defendant, Peninsula expressly reserves the right to identify additional claims and products in its infringement contentions in accordance with applicable local rules and the Court's case management order. Specifically identified claims throughout this Complaint are provided for notice pleading only.

30.    By way of illustration only, Defendant's '009 Accused Instrumentalities comprise each and every element of claim 1 of the '009 Patent. The '009 Accused Instrumentalities comprise "a base station comprising: one or more processors; and memory storing instructions that, when executed by the one or more processors, cause the base station to: transmit at least one message comprising configuration parameters of one or more secondary cells." *See supra.*, ¶¶ 11-12 (showing Verizon operates a 3GPP 5G network which comprises base stations, i.e., Next Generation Node Bs (gNBs)). For example, the '009 Accused Instrumentalities include a base station, i.e., Next Generation NodeB (gNB), that contains instruction stored in memory that, when executed by a processor, cause a gNB to send a *RRCReconfiguration* message comprising configuration parameters of one or more secondary cells:[2]



**Figure 5.3.5.1-1: RRC reconfiguration, successful**

The purpose of this procedure is to modify an RRC connection, e.g. to establish/modify/release RBs, to perform reconfiguration with sync, to setup/modify/release measurements, to add/modify/release SCells and cell groups. As part of the procedure, NAS dedicated information may be transferred from the Network to the UE.

31.    The '009 Accused Instrumentalities comprise a base station caused to "receive a power headroom report media access control control element (PHR MAC CE) comprising a

---

[2] *See, e.g.,* 3GPP TS 38.331 V15.4.0 (2018-12), pgs. 15, 40, 127-129, 178-181, 314, 324-325 (showing the *RRCReconfiguration* message contains the *secondaryCellGroup* and *masterCellGroup* information elements (IEs) for configuring the SCG and MCG respectively and each contains the *CellGroupConfig* IE; the *CellGroupConfig* contains the *ServCellIndex* and *SCellIndex* IEs; and the *ServCellIndex* and *SCellIndex* IEs reference the secondary cells which are configured by configuration parameters within *CellGroupConfig*, such as *sCellToAddModList*).

presence field comprising a plurality of presence bits, wherein: the presence field is of a fixed size of one octet when up to seven secondary cells are configured in the wireless device, each cell in the one or more secondary cells having a cell index with a value between one and seven; and the presence field is of a fixed size of four octets when the one or more secondary cells comprise more than seven secondary cells with configured uplinks." For example, a gNB of the '009 Accused Instrumentalities receives a PHR MAC CE message that contains a presence of a PH per Serving Cell bitmap, which is one octet in size if less than 8 secondary cells are present and four octets in size if more than 8 secondary cells are present:[3]

> The Power Headroom reporting procedure is used to provide the serving gNB with the following information:

> 3> instruct the Multiplexing and Assembly procedure to generate and transmit the Multiple Entry PHR MAC CE as defined in subclause 6.1.3.9 based on the values reported by the physical layer.

> A single octet bitmap is used for indicating the presence of PH per Serving Cell when the highest *ServCellIndex* of Serving Cell with configured uplink is less than 8, otherwise four octets are used.

    32.    The '009 Accused Instrumentalities comprise a base station caused to "transmit one or more control commands employing at least the PHR MAC CE." For example, a gNB of the '009 Accused Instrumentalities uses the received PHR MAC CE to transmit DCI commands for power-aware packet scheduling to enable a user equipment (e.g. mobile phone) to determine a PUSCH transmission power:[4]

> Power headroom reports (PHR) are needed to provide support for power-aware packet scheduling. In NR, three types of reporting are supported: a first one for PUSCH transmission, a second one for PUSCH and PUCCH transmission in an LTE Cell Group in EN-DC (see TS 37.340 [21]) and a third one for SRS transmission on SCells configured with SRS only. In case of CA, when no transmission takes place on an activated SCell, a reference power is used to provide a virtual report. Power headroom reports are transmitted using MAC signalling.

---

[3] *See, e.g.,* 3GPP TS 38.321 V15.4.0 (2018-12), pgs. 36-37, 59.
[4] *See, e.g.,* 3GPP TS 38.300 V15.7.0 (2019-09), pgs. 63-64 (showing the base station utilizes PHR MAC CEs to support power aware packet scheduling for a PUSCH transmission); *see also* 3GPP TS 38.212 V15.4.0 (2018-12), pgs. 73-77 (shows a DCI command is used for scheduling of a PUSCH transmission and that a DCI command contains a Transmit Power Control (TPC) command value); *see also* 3GPP TS 38.213 V15.4.0 (2018-12), pgs. 14-19 (showing that a user equipment (UE) calculates PUSCH transmission power using the TPC command field value).

DCI format 0_0 is used for the scheduling of PUSCH in one cell.

The following information is transmitted by means of the DCI format 0_0 with CRC scrambled by C-RNTI or CS-RNTI or MCS-C-RNTI:

- TPC command for scheduled PUSCH – 2 bits as defined in Subclause 7.1.1 of [5, TS 38.213]

33.    Defendant has committed the foregoing infringing activities without a license.

34.    Peninsula has been damaged as a result of Defendant's infringement described in this Count. Defendant is, thus, liable to Peninsula in an amount that adequately compensates Peninsula for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

35.    Despite having knowledge of the '009 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '009 Patent, Verizon has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. Verizon's infringing activities relative to the '009 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Peninsula's rights with respect to the '009 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT II

### (INFRINGEMENT OF U.S. PATENT NO. 11,889,471)

36.    Plaintiff incorporates the preceding paragraphs herein by reference.

37.    Peninsula is the assignee of the '471 Patent, with ownership of all substantial rights, title, and interest in and to the '471 Patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

38.    The '471 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on January 30,2024, after full and fair examination.

39.    Defendant has directly infringed and directly infringes one or more claims pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, including at least claim 1 of

the '471 Patent in this District and elsewhere in Texas and the United States through the provisioning and operation of its cellular network. Such infringement includes, but is not limited to, the making, using, offering to sell, and selling of cellular services, products, and/or networks that leverage and infringe the inventions of the '471 Patent, and Defendant performing methods covered by the inventions of the '471 Patent. Defendant's 4G/LTE cellular network includes core network equipment configured to support 4G communications (collectively, the "'471 Accused Instrumentalities"). The '471 Accused Products are configured to operate, and do operate, according to 3GPP standards and, as illustrated below, support and implement IMSI offset paging coordination techniques covered by the '471 Patent.

40.    By way of example only, Defendant's '471 Accused Instrumentalities satisfy each and every element of claim 1 of the '471 Patent. The '471 Accused Instrumentalities perform a method comprising, "receiving, from a wireless device by a core network node of a first public land mobile network (PLMN), a requested international mobile subscriber identity (IMSI) offset value for offsetting an IMSI of the wireless device." For example, the '471 Accused Instrumentalities include core network components, e.g., the mobility management entity (MME), that receive a requested IMSI offset value from a wireless device (e.g., a mobile handset) for offsetting its IMSI. *See* 3GPP TS 23.401 V17.1.0 (2021-06), § 4.3.33.5 ("To avoid possible paging occasion collision and to enhance the likelihood paging is received successfully for different USIMs, the UE may provide, for at least one USIM, a Requested IMSI Offset value that is used for determination of paging occasions. Upon reception of a Requested IMSI Offset value from UE in Attach Request or Tracking Area Update Request, a supporting MME provides an Accepted IMSI Offset value to the UE in the Attach Accept or Tracking Area Update Accept message to acknowledge it supports the feature and provide the accepted value.") (emphasis added).

41.    The '471 Accused Instrumentalities further perform the following step of claim 1: "transmitting, from the core network node to the wireless device, an accepted IMSI offset value for offsetting the IMSI of the wireless device." For example, "[u]pon reception of a Requested IMSI Offset value from UE in Attach Request or Tracking Area Update Request, a supporting MME provides an Accepted IMSI Offset value to the UE in the Attach Accept or Tracking Area Update Accept message to acknowledge it supports the feature and provide the accepted value." *Id.*

42.    The '471 Accused Instrumentalities further perform the following step of claim 1: "wherein first paging occasions of the first PLMN are derived using an alternative IMSI determined based on a sum of: the IMSI of the wireless device; and the accepted IMSI offset value." For example, the following part of § 4.3.33.5 of 3GPP TS 23.401 V17.1.0 (2021-06) describes that "[t]he UE and the network use the accepted IMSI Offset to determine the paging occasion. The UE and MME use the Accepted IMSI Offset value to calculate the alternative IMSI value that is determined based on UE's IMSI." *Id.* The "[a]lternative IMSI value = [MCC] [MNC] [(MSIN value + Accepted IMSI Offset) mod (MSIN address space)] where: the MCC, MNC and MSIN value are the fields of the UE's IMSI as defined in TS 23.003." *Id.* And "[t]he MME uses the Alternative IMSI value to compute the UE Identity Index Value. The MME sends the UE Identity Index Value to RAN in the Paging message (see TS 36.413 [36]) for RAN to derive the paging occasions according to TS 36.304 [34]." *Id.*

43.    Defendant has committed the foregoing infringing activities without a license.

44.    Peninsula has been damaged as a result of Defendant's infringement described in this Count. Defendant is, thus, liable to Peninsula in an amount that adequately compensates

Peninsula for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

45.     Despite having knowledge of the '471 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '471 Patent, Verizon has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. Verizon's infringing activities relative to the '471 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Peninsula's rights with respect to the '471 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT III

### (INFRINGEMENT OF U.S. PATENT NO. 11,910,404)

46.     Plaintiff incorporates the preceding paragraphs herein by reference.

47.     Peninsula is the assignee of the '404 Patent, with ownership of all substantial rights, title, and interest in and to the '404 Patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

48.     The '404 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on February 20, 2024, after full and fair examination.

49.     Defendant has directly infringed and directly infringes one or more claims pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, including at least claim 11 of the '404 Patent in this District and elsewhere in Texas and the United States through the provisioning and operation of its cellular network. Such infringement includes, but is not limited to, the making, using, offering to sell, and selling of cellular services, products, and/or networks that leverage and infringe the inventions of the '404 Patent, and Defendant performing methods covered by the inventions of the '404 Patent. Defendant's 5G cellular network includes base station equipment configured to support 5G communications (collectively, the "'404 Accused

Instrumentalities"). The '404 Accused Products are configured to operate, and do operate, according to 3GPP standards and, as illustrated below, support and implement PUSCH scheduling techniques covered by the '404 Patent.

50.    By way of example only, Defendant's '404 Accused Instrumentalities satisfy each and every element of claim 11 of the '404 Patent. The '404 Accused Instrumentalities comprise "[a] base station comprising: one or more processors; and memory storing instructions that, when executed by the one or more processors, cause the base station to: receive, from a wireless device, a wireless device capability message comprising at least one parameter indicating a first physical uplink shared channel (PUSCH) processing period." *See supra.*, ¶¶ 11-12 (showing Verizon operates a 3GPP 5G network which comprises base stations, i.e., Next Generation Node Bs (gNBs)). For example, the '404 Accused Instrumentalities include a base station, i.e., Next Generation NodeB (gNB), that contains instruction stored in memory that, when executed by a processor, cause a gNB to receive, from a user equipment (UE), a *UECapabilityInformation* message (i.e., "a wireless device capability message") that includes *UECapabilityInformation-IEs*. *See, e.g.,* 3GPP TS 38.331 V15.4.0 (2018-12), §§ 5.6.1, 6.2.2 (message definition for UECapabilityInformation), 6.3.3. The base station is configured to receive *UECapabilityInformation-IEs* that include a *FeatureSetUplink* information element with pusch-ProcessingType2, which comprise up to three ProcessingParameters that indicate PUSCH processing capabilities supported by the UE (i.e., "at least one parameter indicating a first PUSCH processing period"). *See, e.g.,* 3GPP TS 38.331 V15.4.0 (2018-12), § 6.3.3 (*FeatureSetUplink* information element, *Processing Parameters* information element).

51.    The PUSCH processing period is between "a reception time of a downlink control information (DCI) comprising a resource assignment" and "a PUSCH transmission time of the

resource assignment." For example, the PUSCH processing period ($T_{proc,2}$) begins following the reception of the last symbol of the PDCCH carrying the DCI scheduling the PUSCH and is calculated using a value of PUSCH preparation time $N_2$ identified based on parameters in *UECapabilityInformation*. *See, e.g.,* 3GPP TS 38.214 V15.4.0 (2018-12), § 6.4 (UE PUSCH preparation procedure time). A UE may only transmit a transport block if the first uplink symbol in the PUSCH allocation is no earlier than $T_{proc,2}$ after reception of the DCI scheduling the PUSCH. *See, e.g., id.* Thus, the processing type parameter(s) indicate a PUSCH preparation time between the reception time of a DCI and a PUSCH transmission time.

52.    The '404 Accused Instrumentalities also include instructions that, when executed by the one or more processors, cause the base station to "transmit, to the wireless device, a first DCI indicating a first resource assignment occurring after a time period from when the wireless device receives the first DCI, wherein the time period is equal to or greater than the first PUSCH processing period." For example, the '404 Accused Instrumentalities include a gNB that contains instruction stored in memory that, when executed by a processor, cause a gNB to transmit, to a UE, DCI format 0_0 or DCI format 0_1 comprising information indicating a PUSCH resource assignment (i.e., "a first DCI indicating a first resource assignment occurring after a time period from when the first DCI is received by the wireless device"). *See, e.g.,* 3GPP TS 38.212 V15.4.0 (2018-12), §§ 7.3.1.1.1, 7.3.1.1.2. The DCI includes information that indicates, among other things, a slot offset $K_2$ (the slot offset (in slots) between the PDCCH slot (n) and the PUSCH slot (n+ $K_2$)) and a start and length indicator value (SLIV) that indicates a starting symbol and length within the slot. *See, e.g., id.* §§ 7.3.1.1.1, 7.3.1.1.2 (specifying TDRA field); 3GPP TS 38.214 V15.4.0 (2018-12), § 6.1.2.1 (defining PUSCH time-domain resource allocation table and how $K_2$

and SLIV extracted). $K_2$ is selected to ensure that the time from the end of PDCCH to the start of the PUSCH is at least $T_{proc,2}$. *See, e.g.,* 3GPP TS 38.214 V15.4.0 (2018-12), § 6.4.

53.    The '404 Accused Instrumentalities also include instructions that, when executed by the one or more processors, cause the base station to "receive a transport block via the first resource assignment." For example, the '404 Accused Instrumentalities include a gNB that contains instruction stored in memory that, when executed by a processor, cause a gNB to receive a transport block from a UE via a PUSCH allocation from the gNB. *See, e.g.,* 3GPP TS 38.214 V15.4.0 (2018-12), § 6.4 (explaining preparation and timing procedure for UE transmission of transport block on PUSCH).

54.    Defendant has committed the foregoing infringing activities without a license.

55.    Peninsula has been damaged as a result of Defendant's infringement described in this Count. Defendant is, thus, liable to Peninsula in an amount that adequately compensates Peninsula for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

56.    Despite having knowledge of the '404 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '404 Patent, Verizon has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. Verizon's infringing activities relative to the '404 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Peninsula's rights with respect to the '404 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT IV

### (INFRINGEMENT OF U.S. PATENT NO. 11,917,549)

57.    Plaintiff incorporates the preceding paragraphs herein by reference.

58. Peninsula is the assignee of the '549 Patent, with ownership of all substantial rights, title, and interest in and to the '549 Patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

59. The '549 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on February 27, 2024, after full and fair examination.

60. Defendant has directly infringed and directly infringes one or more claims pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, including at least claim 16 of the '549 Patent in this District and elsewhere in Texas and the United States through the provisioning and operation of its cellular network. Such infringement includes, but is not limited to, the making, using, offering to sell, and selling of cellular services, products, and/or networks that leverage and infringe the inventions of the '549 Patent, and Defendant performing methods covered by the inventions of the '549 Patent. Defendant's cellular network includes base station equipment configured to support 5G communications (collectively, the "'549 Accused Instrumentalities"). The '549 Accused Products are configured to operate, and do operate, according to 3GPP standards and, as illustrated below, support and implement multicarrier optimization techniques covered by the '549 Patent.

61. By way of illustration only, Defendant's '549 Accused Instrumentalities comprise each and every element of claim 16 of the '549 Patent. The '549 Accused Instrumentalities comprise "a base station comprising: one or more processors; and memory storing instructions that, when executed by the one or more processors, cause the base station to: transmit, to a wireless device, one or more radio resource control messages comprising: at least one first power parameter indicating a first maximum total transmit power of a first group comprising one or more first cells of a first frequency band; and at least one second power parameter indicating a second maximum

total transmit power of a second group comprising one or more second cells of a second frequency band different from the first frequency band." *See supra.*, ¶¶ 11-12 (showing Verizon operates a 3GPP 5G network which comprises base stations, i.e., New Generation Node Bs (gNBs)). For example, in an NR NR dual connectivity (NR-DC) environment, the '549 Accused Instrumentalities comprise a base station, i.e., Next Generation NodeB (gNB), that sends to a user equipment (UE) a *RRCReconfiguration* message comprising the maximum transmit power allowed to be used by a UE, e.g., a *p-NR-FR1* parameter and a *p-NR-FR2* parameter, for a secondary cell group (SCG) using New Radio (NR) radio access (i.e., first cell group) and a master cell group (MCG) using NR radio access (i.e., second cell group):[5]



**Figure 5.3.5.1-1: RRC reconfiguration, successful**

*p-NR-FR1*
The maximum total transmit power to be used by the UE in this NR cell group across all serving cells in frequency range 1 (FR1). The maximum transmit power that the UE may use may be additionally limited by *p-Max* (configured in *FrequencyInfoUL*) and by *p-UE-FR1* (configured total for all serving cells operating on FR1).
*p-NR-FR2*
The maximum total transmit power to be used by the UE in this NR cell group across all serving cells in frequency range 2 (FR2). The maximum transmit power that the UE may use may be additionally limited by *p-Max* (configured in *FrequencyInfoUL*) and by *p-UE-FR2* (configured total for all serving cells operating on FR2). This field is only used in NR-DC. A UE does not expect to be configured with this parameter in this release of the specification.

---

[5] *See, e.g.,* 3GPP TS 38.331 V17.2.0 (2022-09), pgs. 73, 346-375, 512-521, 715-723 (showing a *RRCReconfiguration* message contains a *CellGroupConfig* IE, which contains a *PhysicalCellGroupConfig* IE, which contains a *p-NR-FR1* and *p-NR-FR2* parameters, which is the maximum total transmit power to be used by a UE in a NR cell group in a frequency range) *see also* 3GPP TS 38.213 V17.2.0 (2022-06), pgs. 45-47 (showing a user equipment (UE) in an NR-DC environment is configured with a SCG using NR radio access and an MCG using NR radio access).

---

### 7.6.2    NR-DC

The UE procedures described in this clause are not applicable if the UE is provided *scg-State* [12, TS 38.331].

If a UE is configured with an MCG using NR radio access in FR1 or in FR2 and with a SCG using NR radio access in FR2 or in FR1, respectively, the UE performs transmission power control independently per cell group as described in clauses 7.1 through 7.5.

If a UE is configured with an MCG and a SCG using NR radio access in FR1 and/or in FR2, the UE is configured a maximum power $P_{MCG}$ for transmissions on the MCG by *p-NR-FR1* and/or by *p-NR-FR2* and a maximum power $P_{SCG}$ for transmissions on the SCG by *p-NR-FR1* and/or by *p-NR-FR2* and with an inter-CG power sharing mode by *nrdc-PCmode-FR1* for FR1 and/or by *nrdc-PCmode-FR2* for FR2. The UE determines a transmission power on the MCG and a transmission power on the SCG per frequency range.

---

62.    Defendant's '549 Accused Instrumentalities comprise a base station caused to "receive: one or more first signals via the first group, wherein a first transmission power of at least one of the one or more first signals is scaled based on a first total power for transmission of the one or more first signals exceeding the first maximum total transmit power; and one or more second signals via the second group, wherein a second transmission power of at least one of the one or more second signals is scaled based on a second total power for transmission of the one or more second signals exceeding the second maximum total transmit power." For example, the '549 Accused Instrumentalities comprise a base station that receives transmissions from the UE on the MCG where the maximum transmission power is scaled down, i.e., decreased, based on the signals on the MCG exceeding maximum transmission power $\hat{P}_{MCG}$ ($\hat{P}_{CMAX}$), and receives transmissions from the UE on the SCG where the maximum transmission power is scaled down, i.e., decreased, based on the signals on the SCG exceeding maximum transmission power $\hat{P}_{SCG}$ ($\hat{P}_{CMAX}$):[6]

---

[6] *See, e.g.,* 3GPP TS 38.213 V17.2.0 (2022-06), pgs. 21-22, 43, 45-47 (showing transmission power of signals on the MCG and signals on the SCG are each scaled down so as not to exceed the configured maximum transmission power, $\hat{P}_{MCG}$ ($\hat{P}_{CMAX}$) and $\hat{P}_{SCG}$ ($\hat{P}_{CMAX}$), respectively); *see also* 3GPP TS 38.101-1 V17.2.0 (2021-06), pgs. 228-230.

## 7.6.2    NR-DC

The UE procedures described in this clause are not applicable if the UE is provided *scg-State* [12, TS 38.331].

If a UE is configured with an MCG using NR radio access in FR1 or in FR2 and with a SCG using NR radio access in FR2 or in FR1, respectively, the UE performs transmission power control independently per cell group as described in clauses 7.1 through 7.5.

If a UE is configured with an MCG and a SCG using NR radio access in FR1 and/or in FR2, the UE is configured a maximum power $P_{MCG}$ for transmissions on the MCG by *p-NR-FR1* and/or *p-NR-FR2* and a maximum power $P_{SCG}$ for transmissions on the SCG by *p-NR-FR1* and/or *p-NR-FR2* and with an inter-CG power sharing mode by *nrdc-PCmode-FR1* for FR1 and/or by *nrdc-PCmode-FR2* for FR2. The UE determines a transmission power on the MCG and a transmission power on the SCG per frequency range.

If a UE is provided *semi-static-mode1* for *nrdc-PCmode-FR1* or for *nrdc-PCmode-FR2*, the UE determines a transmission power for the MCG or for the SCG as described in clauses 7.1 through 7.5 using $P_{MCG}$ or $P_{SCG}$ as the maximum transmission power, respectively.

## 7.1.1    UE behaviour

If a UE transmits a PUSCH on active UL BWP $b$ of carrier $f$ of serving cell $c$ using parameter set configuration with index $j$ and PUSCH power control adjustment state with index $l$, the UE determines the PUSCH transmission power $P_{\text{PUSCH},b,f,c}(i,j,q_d,l)$ in PUSCH transmission occasion $i$ as

$$P_{\text{PUSCH},b,f,c}(i,j,q_d,l) = \min \begin{Bmatrix} P_{\text{CMAX},f,c}(i), \\ P_{\text{O\_PUSCH},b,f,c}(j) + 10\log_{10}(2^{\mu} \cdot M_{\text{RB},b,f,c}^{\text{PUSCH}}(i)) + \alpha_{b,f,c}(j) \cdot PL_{b,f,c}(q_d) + \Delta_{\text{TF},b,f,c}(i) + f_{b,f,c}(i,l) \end{Bmatrix}$$
$$[\text{dBm}]$$

where,

- $P_{\text{CMAX},f,c}(i)$ is the UE configured maximum output power defined in [8-1, TS 38.101-1], [8-2, TS 38.101-2] and [8-3, TS 38.101-3] for carrier $f$ of serving cell $c$ in PUSCH transmission occasion $i$.

## 7.5 Prioritizations for transmission power reductions

For single cell operation with two uplink carriers or for operation with carrier aggregation, if a total UE transmit power for PUSCH or PUCCH or PRACH or SRS transmissions on serving cells in a frequency range in a respective transmission occasion $i$ would exceed $\hat{P}_{\text{CMAX}}(i)$, where $\hat{P}_{\text{CMAX}}(i)$ is the linear value of $P_{\text{CMAX}}(i)$ in transmission occasion $i$ as defined in [8-1, TS 38.101-1] for FR1 and [8-2, TS 38.101-2] for FR2, the UE allocates power to PUSCH/PUCCH/PRACH/SRS transmissions according to the following priority order (in descending order) so that the total UE transmit power for transmissions on serving cells in the frequency range is smaller than or equal to $\hat{P}_{\text{CMAX}}(i)$ for that frequency range in every symbol of transmission occasion $i$. For the purpose of power allocation in this clause, if a UE is provided *UCI-MuxWithDifferentPriority* and the UE multiplexes HARQ-ACK information in a PUSCH, a priority index of the PUSCH is the larger of (a) the priority index of the PUSCH according to clause 9 and (b) the larger priority index of the HARQ-ACK information. When determining a total transmit power for serving cells in a frequency range in a symbol of transmission occasion $i$, the UE does not include power for transmissions starting after the symbol of transmission occasion $i$. The total UE transmit power in a symbol of a slot is defined as the sum of the linear values of UE transmit powers for PUSCH, PUCCH, PRACH, and SRS in the symbol of the slot.

63.    Defendant has committed the foregoing infringing activities without a license.

64.     Peninsula has been damaged as a result of Defendant's infringement described in this Count. Defendant is, thus, liable to Peninsula in an amount that adequately compensates Peninsula for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

65.     Despite having knowledge of the '549 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '549 Patent, Verizon has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. Verizon's infringing activities relative to the '549 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Peninsula's rights with respect to the '549 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT V

### (INFRINGEMENT OF U.S. PATENT NO. 12,004,087)

66.     Plaintiff incorporates the preceding paragraphs herein by reference.

67.     Peninsula is the assignee of the '087 Patent, with ownership of all substantial rights, title, and interest in and to the '087 Patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

68.     The '087 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on June 4, 2024, after full and fair examination.

69.     Defendant has directly infringed and directly infringes one or more claims pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, including at least claim 1 of the '087 Patent in this District and elsewhere in Texas and the United States through the provisioning and operation of its cellular network. Such infringement includes, but is not limited to, Defendant performing methods covered by the inventions of the '087 Patent, and the making, using, offering to sell, and selling of cellular services, products, and/or networks that leverage and

infringe the inventions of the '087 Patent. Defendant's cellular network includes base station equipment configured to support 4G/5G communications (collectively, the "'087 Accused Instrumentalities"). The '087 Accused Products are configured to operate, and do operate, according to 3GPP standards and, as illustrated below, support and implement multicarrier optimization techniques covered by the '087 Patent.

70.     By way of illustration only, Defendant has performed and is performing, via the '087 Accused Instrumentalities, each and every step of the method of claim 1 of the '087 Patent. Defendant, via the '087 Accused Instrumentalities, performs "a method comprising: transmitting, by a base station to a wireless device: first maximum total transmit power allowed for a first cell group of a first type of radio access technology." *See supra.*, ¶¶ 11-12 (showing Verizon's 3GPP 5G network comprises base stations). For example, in an E-UTRA NR dual connectivity (EN-DC) environment, Defendant, via the '087 Accused Instrumentalities, transmits by Defendant's base station, i.e., Next Generation NodeB (gNB), to a user equipment (UE) a *RRCReconfiguration* message comprising the maximum transmit power allowed to be used by a UE in a New Radio (NR), i.e., 5G radio access, cell group:[7]

---

[7] *See, e.g.,* 3GPP TS 38.331 V15.4.0 (2018-12), pgs. 40, 127, 178, 262-263 (showing a *RRCreconfiguration* message contains a *CellGroupConfig* IE, which contains a *PhysicalCellGroupConfig* IE, which contains a *p-NR-FR1* parameter, which is the maximum total transmit power to be used by a UE in a NR cell group); *see also* 3GPP TS 38.213 V15.4.0 (2018-12), pg. 28 (showing a UE in an EN-DC environment is configured with a maximum transmission power of *p-NR* for transmissions on the SCG using NR radio access).



**Figure 5.3.5.1-1: RRC reconfiguration, successful**

### 7.6.1   EN-DC

If a UE is configured with a MCG using E-UTRA radio access and with a SCG using NR radio access, the UE is configured a maximum power $P_{LTE}$ for transmissions on the MCG by $p$-$MaxEUTRA$ and a maximum power $P_{NR}$ for transmissions in FR1 on the SCG by $p$-$NR$. The UE determines a transmission power for the MCG as described in [13, TS 36.213] using $P_{LTE}$ as the maximum transmission power. The UE determines transmission power for the SCG in FR1 as described Subclauses 7.1 through 7.5 using $P_{NR}$ as the maximum transmission power for $P_{CMAX} \le P_{NR}$. The UE determines transmission power for the SCG in FR2 as described Subclauses 7.1 through 7.5.

*p-NR-FR1*
The maximum total transmit power to be used by the UE in this NR cell group across all serving cells in frequency range 1 (FR1). The maximum transmit power that the UE may use may be additionally limited by *p-Max* (configured in FrequencyInfoUL) and by *p-UE-FR1* (configured total for all serving cells operating on FR1).

71.     Defendant, via the '087 Accused Instrumentalities, performs "transmitting, by a base station to a wireless device: a second maximum total transmit power allowed for a second cell group of a second type of radio access technology different from the first type of radio access technology." For example, in an EN-DC environment, Defendant, via the '087 Accused Instrumentalities, transmits to a user equipment (UE) a *RRCConnectionReconfiguration* message comprising the maximum transmit power allowed to be used by a UE in a E-UTRA, i.e., 4G radio access, cell group:[8]

---

[8] *See, e.g.,* 3GPP TS 36.331 V15.4.0 (2018-12), pgs. 108, 331-337 (showing a *RRCConnectionReconfiguration* message contains a *p-MaxEUTRA* parameter, which is the maximum total transmission power to be used by the UE in a E-UTRA cell group); *see also* 3GPP TS 38.213 V15.4.0 (2018-12), pg. 28 (showing a UE in an EN-DC environment is configured with a maximum transmission power of *p-MaxEUTRA* for transmissions on the MCG using E-UTRA radio access).



**Figure 5.3.5.1-1: RRC connection reconfiguration, successful**

### 7.6.1    EN-DC

If a UE is configured with a MCG using E-UTRA radio access and with a SCG using NR radio access, the UE is configured a maximum power $P_{LTE}$ for transmissions on the MCG by *p-MaxEUTRA* and a maximum power $P_{NR}$ for transmissions in FR1 on the SCG by *p-NR*. The UE determines a transmission power for the MCG as described in [13, TS 36.213] using $P_{LTE}$ as the maximum transmission power. The UE determines transmission power for the SCG in FR1 as described Subclauses 7.1 through 7.5 using $P_{NR}$ as the maximum transmission power for $P_{CMAX} \le P_{NR}$. The UE determines transmission power for the SCG in FR2 as described Subclauses 7.1 through 7.5.

**_p-MaxEUTRA_**
Indicates the maximum power available for LTE.

72.     Defendant, via the '087 Accused Instrumentalities, performs the transmitting a second maximum total transmit power "wherein a power value is determined by the wireless device to be exceeded by a total transmission power that is based on: a first power for transmission of one or more first uplink signals via the first cell group, wherein the first power is less than or equal to the first maximum total transmit power; and a second power for transmission of one or more second uplink signals via the second cell group, wherein the second power is less than or equal to the second maximum total transmit power." For example, the Defendant-supplied UE, i.e., mobile device, included in the '087 Accused Instrumentalities, determines $\hat{P}_{MCG}$, a current value of the transmission power over the Master Cell Group (MCG), i.e., 4G radio access, which is less than or equal to the maximum power $\hat{P}_{LTE}$, and determines $\hat{P}_{SCG}$, a current value of the transmission power over the Secondary Cell Group (SCG), i.e., 5G radio access, which is less than

or equal to the maximum power $\widehat{P}_{NR}$, and compares those values together to a total maximum

transmission power $\hat{P}_{Total}^{EN-DC}$:[9]

---

## 7.6.1    EN-DC

If a UE is configured with a MCG using E-UTRA radio access and with a SCG using NR radio access, the UE is configured a maximum power $P_{LTE}$ for transmissions on the MCG by *p-MaxEUTRA* and a maximum power $P_{NR}$ for transmissions in FR1 on the SCG by *p-NR*. The UE determines a transmission power for the MCG as described in [13, TS 36.213] using $P_{LTE}$ as the maximum transmission power. The UE determines transmission power for the SCG in FR1 as described Subclauses 7.1 through 7.5 using $P_{NR}$ as the maximum transmission power for $P_{CMAX} \le P_{NR}$. The UE determines transmission power for the SCG in FR2 as described Subclauses 7.1 through 7.5.

If a UE is configured with $\hat{P}_{LTE} + \hat{P}_{NR} > \hat{P}_{Total}^{EN-DC}$, where $\hat{P}_{LTE}$ is the linear value of $P_{LTE}$, $\hat{P}_{NR}$ is the linear value of $P_{NR}$, and $\hat{P}_{Total}^{EN-DC}$ is the linear value of a configured maximum transmission power for EN-DC operation as defined in [8-3, TS 38.101-3] for FR1, the UE determines a transmission power for the SCG as follows.

- if UE transmission(s) in subframe $i_1$ of the MCG overlap in time with UE transmission(s) in slot $i_2$ of the SCG in FR1, and

- if $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) > \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$ of the SCG,

   the UE reduces transmission power in any portion of slot $i_2$ of the SCG so that $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \le \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$, where $\hat{P}_{MCG}(i_1)$ and $\hat{P}_{SCG}(i_2)$ are the linear values of the total UE transmission powers in subframe $i_1$ of the MCG and in slot $i_2$ of the SCG in FR1, respectively. The UE is not required to transmit in any portion of slot $i_2$ of the SCG if $\hat{P}_{SCG}(i_2)$ would need to be reduced by more than the value provided by $X_{SCALE}$ in order for $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \le \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$ of the SCG. The UE is required to transmit in slot $i_2$ of the SCG if $\hat{P}_{SCG}(i_2)$ would not need to be reduced by more than the value provided by $X_{SCALE}$ in order for $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \le \hat{P}_{Total}^{EN-DC}$ in all portions of slot $i_2$.

---

73.    Defendant, via the '087 Accused Instrumentalities, performs "receiving, from the wireless device, at least one of the one or more second uplink signals and not the one or more first uplink signals based on a scheduled transmission of the one or more first uplink signals of the first cell group of the first type of radio access technology being dropped by the wireless device in response to: the total transmission power exceeding the power value, wherein the power value is a maximum transmit power of the wireless device." For example, Defendant, via the '087 Accused Instrumentalities, receives transmissions from the UE over the MCG, i.e. 4G radio access, but will

---

[9] *See, e.g.,* 3GPP TS 38.213 V15.4.0 (2018-12), pg. 28.

not receive some or all transmissions over the SCG, i.e., 5G radio access, if the total transmission

power across both cell groups exceeds the UE's total maximum transmission power $\hat{P}_{Total}^{EN-DC}$:[10]

- if UE transmission(s) in subframe $i_1$ of the MCG overlap in time with UE transmission(s) in slot $i_2$ of the SCG in FR1, and

- if $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) > \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$ of the SCG,

    the UE reduces transmission power in any portion of slot $i_2$ of the SCG so that $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \leq \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$, where $\hat{P}_{MCG}(i_1)$ and $\hat{P}_{SCG}(i_2)$ are the linear values of the total UE transmission powers in subframe $i_1$ of the MCG and in slot $i_2$ of the SCG in FR1, respectively. The UE is not required to transmit in any portion of slot $i_2$ of the SCG if $\hat{P}_{SCG}(i_2)$ would need to be reduced by more than the value provided by $X_{SCALE}$ in order for $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \leq \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$ of the SCG. The UE is required to transmit in slot $i_2$ of the SCG if $\hat{P}_{SCG}(i_2)$ would not need to be reduced by more than the value provided by $X_{SCALE}$ in order for $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \leq \hat{P}_{Total}^{EN-DC}$ in all portions of slot $i_2$.

74.    Defendant, via the '087 Accused Instrumentalities, performs "receiving, from the wireless device, at least one of the one or more second uplink signals and not the one or more first uplink signals based on a scheduled transmission of the one or more first uplink signals of the first cell group of the first type of radio access technology being dropped by the wireless device in response to: the first type of radio access technology having a lower priority than the second type of radio access technology." For example, Defendant, via the '087 Accused Instrumentalities, receives transmissions from the UE over the MCG, i.e. 4G radio access, but will not receive some or all transmissions over the SCG, i.e., 5G radio access, due to transmissions over SCG having a lower priority than transmissions over MCG:[11]

---

[10] *See, e.g., Id.*
[11] *See, e.g., id.*

- if UE transmission(s) in subframe $i_1$ of the MCG overlap in time with UE transmission(s) in slot $i_2$ of the SCG in FR1, and

- if $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) > \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$ of the SCG,

the UE reduces transmission power in any portion of slot $i_2$ of the SCG so that $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \le \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$, where $\hat{P}_{MCG}(i_1)$ and $\hat{P}_{SCG}(i_2)$ are the linear values of the total UE transmission powers in subframe $i_1$ of the MCG and in slot $i_2$ of the SCG in FR1, respectively. The UE is not required to transmit in any portion of slot $i_2$ of the SCG if $\hat{P}_{SCG}(i_2)$ would need to be reduced by more than the value provided by $X_{SCALE}$ in order for $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \le \hat{P}_{Total}^{EN-DC}$ in any portion of slot $i_2$ of the SCG. The UE is required to transmit in slot $i_2$ of the SCG if $\hat{P}_{SCG}(i_2)$ would not need to be reduced by more than the value provided by $X_{SCALE}$ in order for $\hat{P}_{MCG}(i_1) + \hat{P}_{SCG}(i_2) \le \hat{P}_{Total}^{EN-DC}$ in all portions of slot $i_2$.

75.    Defendant has committed the foregoing infringing activities without a license.

76.    Peninsula has been damaged as a result of Defendant's infringement described in this Count. Defendant is, thus, liable to Peninsula in an amount that adequately compensates Peninsula for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

77.    Despite having knowledge of the '087 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '087 Patent, Verizon has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. Verizon's infringing activities relative to the '087 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Peninsula's rights with respect to the '087 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## <u>COUNT VI</u>

### (INFRINGEMENT OF U.S. PATENT NO. 12,120,775)

78.    Plaintiff incorporates the preceding paragraphs herein by reference.

79.    Peninsula is the assignee of the '775 Patent, with ownership of all substantial rights, title, and interest in and to the '775 Patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

80.     The '775 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on October 15, 2024, after full and fair examination.

81.     Defendant has directly infringed and directly infringes one or more claims pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, including at least claim 1 of the '775 Patent in this District and elsewhere in Texas and the United States through the provisioning and operation of its cellular network. Such infringement includes, but is not limited to, the making, using, offering to sell, and selling of cellular services, products, and/or networks that leverage and infringe the inventions of the '775 Patent, and Defendant performing methods covered by the inventions of the '775 Patent. Defendant's 5G cellular network includes core network equipment configured to support 5G communications (collectively, the "'775 Accused Instrumentalities"). The '775 Accused Products are configured to operate, and do operate, according to 3GPP standards and, as illustrated below, support and implement multi-access packet data unit ("MA PDU") sessions techniques covered by the '775 Patent.

82.     By way of example only, Defendant's '775 Accused Instrumentalities satisfy each and every element of claim 1 of the '775 Patent. The '775 Accused Instrumentalities perform a method comprising, "receiving, by a session management function (SMF) from a user plane function (UPF), a data notification message for a multi access (MA) packet data unit (PDU) session associated with multiple tunnels between multiple access network types and a PDU session anchor." For example, the '775 Accused Instrumentalities perform the receiving step while establishing an MA PDU session, which is "the key enabler of [Access Traffic Steering, Switching and Splitting] ATSSS". *See* 3GPP TS 23.502 V17.1.0 (2021-06), § 4.22.1. When the network triggers an MA PDU session, it is generally based on the signaling flow in Figure 4.2.3.3-1 below. *Id.* at § 4.22.9.4 (Network Triggered Service Request).



**Figure 4.2.3.3-1: Network Triggered Service Request**

83.    As shown above, the SMF receives a Data Notification message from a UPF (user plane function) at Step 2a (Fig. 4.2.3.3-1). That data notification message can be for an MA PDU session. *See, e.g., id.* at 4.2.3.3 (describing step 1 in the Figure 4.2.3.3-1: "[w]hen a UPF receives downlink data for a PDU Session and there is no AN Tunnel Info stored in UPF for the PDU Session … ") (emphasis added); *id.* at § 4.22.1 (introducing the ATSSS Procedures and describing that "[t]he key enabler of ATSSS is the Multi Access-PDU (MA PDU) Session."); *id.*

at § 4.22.9.4 ("The signalling flow for a Network Triggered Service Request is based on the signalling flow in Figure 4.2.3.3-1 with the following differences and clarifications … .").

84.    The MA PDU session is "associated with multiple tunnels between multiple access network types and a PDU session anchor" as claimed. *Id.* at § 4.22.1 ("As specified in clause 5.32.1 of TS 23.501 [2], a MA PDU Session is a PDU Session associated with <u>two independent N3/N9 tunnels</u> between the <u>PSA</u> and <u>RAN/AN and with multiple access types</u>, i.e. with one 3GPP access and one non-3GPP access both connected to 5GC.").

85.    At Step 3a, for example, the '775 Accused Instrumentalities perform the following method step from claim 1: "sending, by the SMF to an access and mobility management function (AMF), a first request to activate user plane resources of an access network type from among the multiple access network types of the MA PDU session, wherein the first request comprises an indication of the access network type, from among the multiple access network types." *Id.* at § 4.22.9.4 ("In step 3a, the SMF indicates to the AMF the access type (3GPP access or non-3GPP access) over which the user plane resources are to be activated for the MA PDU Session.").

86.    Defendant has committed the foregoing infringing activities without a license.

87.    Peninsula has been damaged as a result of Defendant's infringement described in this Count. Defendant is, thus, liable to Peninsula in an amount that adequately compensates Peninsula for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

88.    Despite having knowledge of the '775 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '775 Patent, Verizon has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. Verizon's infringing activities relative to the '775 Patent have, thus, been, and continue to be, willful, wanton,

and deliberate in disregard of Peninsula's rights with respect to the '775 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT VII

### (INFRINGEMENT OF U.S. PATENT NO. 12,207,201)

89.     Plaintiff incorporates the preceding paragraphs herein by reference.

90.     Peninsula is the assignee of the '201 Patent, with ownership of all substantial rights, title, and interest in and to the '201 Patent including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

91.     The '201 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on January 21,2025, after full and fair examination.

92.     Defendant has directly infringed and directly infringes one or more claims pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, including at least claim 11 of the '201 Patent in this District and elsewhere in Texas and the United States through the provisioning and operation of its cellular network. Such infringement includes, but is not limited to, the making, using, offering to sell, and selling of cellular services, products, and/or networks that leverage and infringe the inventions of the '201 Patent, and Defendant performing methods covered by the inventions of the '201 Patent. Defendant's 4G and 5G cellular network includes base station equipment configured to support 4G and/or 5G communications (collectively, the "'201 Accused Instrumentalities"). The '201 Accused Products are configured to operate, and do operate, according to 3GPP standards and, as illustrated below, support and implement uplink power control techniques covered by the '201 Patent.

93.     By way of example only, Defendant's '201 Accused Instrumentalities that support 5G satisfy each and every element of claim 11 of the '201 Patent. The '201 Accused Instrumentalities that support 5G comprise "[a] base station comprising: one or more processors;

and memory storing instructions that, when executed by the one or more processors, cause the base station to perform operations comprising: transmitting configuration parameters of a plurality of cells grouped into: a primary physical uplink control channel (PUCCH) group comprising a primary cell with a primary PUCCH; and a secondary PUCCH group comprising a PUCCH secondary cell with a secondary PUCCH." For example, the '201 Accused Instrumentalities that support 5G include a base station, i.e., Next Generation NodeB (gNB), that contains instruction stored in memory that, when executed by a processor, cause a gNB to transmit RRC messaging that configures a plurality of cells into a primary PUCCH group (i.e., "a primary physical uplink control channel (PUCCH) group comprising a primary cell with a primary PUCCH") and a secondary PUCCH group (i.e., "a secondary PUCCH group comprising a PUCCH secondary cell with a secondary PUCCH"). A primary PUCCH group refers to a group of serving cells in a carrier aggregation or dual connectivity scenario where the PUCCH is transmitted on the primary cell (PCell), which serves as the anchor for transmitting uplink control information for itself and secondary cells (SCells) within the group, and a secondary PUCCH group is a configuration that enables an SCell (PUCCH SCell) to handle PUCCH for itself and other SCells within the Secondary PUCCH group in carrier aggregation scenarios. *See, e.g.,* 3GPP TS 38.300 V15.4.0 (2018-12), § 10.6 ("SCells of secondary PUCCH group (a group of SCells whose PUCCH signalling is associated with the PUCCH on the PUCCH SCell)").

94.     The '201 Accused Instrumentalities that support 5G also include instructions that, when executed by the one or more processors, cause the base station to "transmit, for a cell in the plurality of cells, downlink control information comprising a PUCCH transmit power control (TPC) command and scheduling information for the cell, wherein the downlink control information does not have either a downlink control information format 3 or a downlink control

32

information format 3A." For example, the '201 Accused Instrumentalities that support 5G include a gNB that contains instruction stored in memory that, when executed by a processor, cause a gNB to transmit DCI format 1_0, which includes a TPC command for scheduled PUCCH (i.e., "a PUCCH transmit power control (TPC) command") and frequency and time domain resource assignment information (i.e., "scheduling information for the cell"). *See, e.g.,* 3GPP TS 38.212 V15.4.0 (2018-12), § 7.3.1.2.1.

95.     The '201 Accused Instrumentalities that support 5G also include instructions that, when executed by the one or more processors, cause the base station to "receive uplink signals with a transmit power calculated, for one of the primary PUCCH or the secondary PUCCH, employing the PUCCH TPC command, wherein the one of the primary PUCCH or the secondary PUCCH is determined based on whether the cell is the primary cell or the PUCCH secondary cell." For example, the '201 Accused Instrumentalities that support 5G include a gNB that contains instruction stored in memory that, when executed by a processor, cause a gNB to receive PUCCH signaling (i.e., "uplink signals") for the primary PUCCH or secondary PUCCH with a PUCCH transmission power, $P_{\text{PUCCH},b,f,c}(i,q_u,q_d,l)$. *See, e.g.,* 3GPP TS 38.213 V15.4.0 (2018-12), § 7.2 ("the UE shall apply the procedures described in this subclause for both primary PUCCH group and secondary PUCCH group"), § 7.2.1. $P_{\text{PUCCH},b,f,c}(i,q_u,q_d,l)$ is calculated using a closed loop power control term $g_{b,f,c}(i,l)$, which is determined using the TPC command value included in DCI format 1_0 (i.e., the transmit power is calculated employing the PUCCH TPC command). *See, e.g.,* 3GPP TS 38.213 V15.4.0 (2018-12), § 7.2.1.

96.     By way of further example, Defendant's '201 Accused Instrumentalities that support 4G also satisfy each and every element of claim 11 of the '201 Patent. The '201 Accused Instrumentalities that support 4G comprise "[a] base station comprising: one or more processors;

and memory storing instructions that, when executed by the one or more processors, cause the base station to perform operations comprising: transmitting configuration parameters of a plurality of cells grouped into: a primary physical uplink control channel (PUCCH) group comprising a primary cell with a primary PUCCH; and a secondary PUCCH group comprising a PUCCH secondary cell with a secondary PUCCH." For example, the '201 Accused Instrumentalities that support 4G include a base station, i.e., Evolved NodeB (eNB), that contains instruction stored in memory that, when executed by a processor, cause an eNB to transmit RRC messaging that configures a plurality of cells into a primary PUCCH group (i.e., "a primary physical uplink control channel (PUCCH) group comprising a primary cell with a primary PUCCH") and a secondary PUCCH group (i.e., "a secondary PUCCH group comprising a PUCCH secondary cell with a secondary PUCCH"). A primary PUCCH group refers to a group of serving cells in a carrier aggregation or dual connectivity scenario where the PUCCH is transmitted on the primary cell (PCell), which serves as the anchor for transmitting uplink control information for itself and secondary cells (SCells) within the group, and a secondary PUCCH group is a configuration that enables an SCell (PUCCH SCell) to handle PUCCH for itself and other SCells within the Secondary PUCCH group in carrier aggregation or dual connectivity scenarios. *See, e.g.,* 3GPP TS 36.300 V13.6.0 (2016-12), § 3.1 (definition of primary PUCCH group, definition of secondary PUCCH group), § 7.5 ("When a PUCCH SCell is configured, RRC configures the mapping of each serving cell to Primary PUCCH group or Secondary PUCCH group, i.e., for each SCell whether the PCell or the PUCCH SCell is used for the transmission of ACK/NAKs and CSI reports").

97.    The '201 Accused Instrumentalities that support 4G also include instructions that, when executed by the one or more processors, cause the base station to "transmit, for a cell in the

plurality of cells, downlink control information comprising a PUCCH transmit power control (TPC) command and scheduling information for the cell, wherein the downlink control information does not have either a downlink control information format 3 or a downlink control information format 3A." For example, the '201 Accused Instrumentalities that support 4G include an eNB that contains instruction stored in memory that, when executed by a processor, cause an eNB to transmit DCI format 1A, which includes a TPC command for PUCCH (i.e., "a PUCCH transmit power control (TPC) command") and resource block assignment (i.e., "scheduling information for the cell"). *See, e.g.,* 3GPP TS 36.212 V13.6.0 (2017-06), § 5.3.3.1.3.

98.     The '201 Accused Instrumentalities that support 4G also include instructions that, when executed by the one or more processors, cause the base station to "receive uplink signals with a transmit power calculated, for one of the primary PUCCH or the secondary PUCCH, employing the PUCCH TPC command, wherein the one of the primary PUCCH or the secondary PUCCH is determined based on whether the cell is the primary cell or the PUCCH secondary cell." For example, the '201 Accused Instrumentalities that support 4G include an eNB that contains instruction stored in memory that, when executed by a processor, cause an eNB to receive PUCCH signaling (i.e., "uplink signals") for the primary PUCCH or secondary PUCCH with a PUCCH transmission power, $P_{\text{PUCCH}}(i)$. *See, e.g.,* 3GPP TS 36.213 v13.6.0 § 5.1.2 ("the UE shall apply the procedures described in this subclause for both primary PUCCH group and secondary PUCCH group"), § 5.1.2.1. $P_{\text{PUCCH}}(i)$ is calculated using a power control adjustment state $g(i)$, which is determined using the TPC command value included in DCI format 1A (i.e., the transmit power is calculated employing the PUCCH TPC command). *See, e.g.,* 3GPP TS 36.213 V13.6.0 (2017-06), § 5.1.2.1.

99.     Defendant has committed the foregoing infringing activities without a license.

100.    Peninsula has been damaged as a result of Defendant's infringement described in this Count. Defendant is, thus, liable to Peninsula in an amount that adequately compensates Peninsula for Defendant's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

101.    Despite having knowledge of the '201 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '201 Patent, Verizon has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. Verizon's infringing activities relative to the '201 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Peninsula's rights with respect to the '201 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## CONCLUSION

102.    Peninsula is entitled to recover from Defendant the damages sustained by Peninsula as a result of Defendant's wrongful acts and infringements in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

103.    Peninsula has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and Peninsula is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

104.    Peninsula hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

105.    Peninsula respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Peninsula the following relief:

(i)      A judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by Defendant;

(ii)     A judgment that Verizon's infringement of the Asserted Patents has been willful;

(iii)    A judgment that Defendant account for and pay to Peninsula all damages and costs incurred by Peninsula because of Defendant's infringing activities and other conduct complained of herein, including an accounting for any sales or damages not presented at trial;

(iv)    A judgment that Defendant account for and pay to Peninsula a reasonable, ongoing, post judgment royalty because of Defendant's infringing activities, including continuing infringing activities, and other conduct complained of herein;

(v)     A judgment that Peninsula be granted pre-judgment and post judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

(vi)    A judgment that this case is exceptional under the provisions of 35 U.S.C. § 285 and award enhanced damages; and

(vii)   Such other and further relief as the Court deems just and equitable.

Dated: October 9, 2025

Respectfully submitted,

*/s/ Patrick J. Conroy*

**Patrick J. Conroy**
Texas Bar No. 24012448
**Ryan P. Griffin**
Texas Bar No. 24053687
**T. William Kennedy Jr.**
Texas Bar No. 24055771
**Jonathan H. Rastegar**
Texas Bar No. 24064043
**Nathan L. Levenson**
Texas Bar No. 24097992
**Brandon G. Moore**
Texas Bar No. 24082372
**NELSON BUMGARDNER
CONROY PC**
2727 N. Harwood St., Suite 250
Dallas, TX 75201
pat@nelbum.com
ryan@nelbum.com
bill@nelbum.com
jon@nelbum.com
nathan@nelbum.com
brandon@nelbum.com

**ATTORNEYS FOR PLAINTIFF
PENINSULA INC.**